**Mark JENKINS**

v.

**GEORGIA POWER COMPANY, INC.**

Civ. No. C85–4251.

United States District Court,
N.D. Georgia,
Atlanta Division.

Aug. 14, 1987.

Nick Long, Long & Vincenzi, Atlanta, Ga., for plaintiff.

Robert L. Pennington, Thomas C. Taylor, Troutman, Sanders, Lockerman & Ashmore, Atlanta, Ga., for defendant.

## ORDER

ORINDA D. EVANS, District Judge.

This diversity action alleging negligence is before the court on Defendant Georgia Power Company's motion for judgment notwithstanding the verdict or alternatively for a new trial. The jury returned a verdict for the Plaintiff in the sum of $515,-000.

On November 8, 1983, Plaintiff Mark Jenkins was severely injured while painting a transmission tower owned by Defendant Georgia Power Company, Inc. (Georgia Power), and situated on an easement belonging to Georgia Power. The injury occurred when Jenkins either touched an uninsulated line carrying 115,000 volts of electricity, or came close enough to permit the electric current to arc from the line to his body.

The paint work was being done for Georgia Power by Nash Industrial Contractors, Inc. (Nash Contractors). It is undisputed that Nash Contractors was an independent contractor, and Plaintiff Jenkins was its employee. Georgia Power and Nash Contractors mutually understood that the 100 transmission towers which were to be

painted carried 15,000 volts of electricity in uninsulated lines, and that the lines would remain energized during painting. The written contract between the parties generally stipulated that all work would be performed in accordance with safety regulations of the Occupational Safety and Health Administration.

Plaintiff Jenkins received a telephone call from Gary Nash, the owner of Nash Contractors, on the morning of November 8, 1983. At that time, Jenkins was 20 years old and was intermittently employed doing various jobs. Nash inquired whether Jenkins would be interested in doing some painting. Jenkins indicated he would. Nash then came by Jenkins' home and informed him that a work crew would be coming by to pick him up to take him to the job site. Jenkins did not recall Nash giving him any information concerning the fact that the job involved painting transmission towers, or that he would be working in close proximity to high voltage wires.

Jenkins was then picked up by Billy Neal Crump, a foreman for Nash Contractors. Crump took Jenkins and others to the tower which would be painted that day. According to Jenkins, Crump simply told him not to touch the wires, which were energized. Jenkins admitted that based on his own knowledge of electricity, he knew it would be very dangerous to touch an energized electrical wire.

Crump explained to Jenkins how to apply the paint. Jenkins was to dip a paint mitt, which would be worn on one hand, into a paint bucket and apply the paint by sliding his mitted hand along the arms of the tower. Jenkins testified that no one gave him any instructions concerning the necessity for staying any particular distance from the wires. The paint was an oil-base formula which has combustible and conductive properties.

Jenkins' injury occurred as he was sitting out on an arm of the tower near the transmission lines. The foreman, Crump, called up from the ground and asked Jenkins how close he was getting to the wires. Jenkins, assuming that Crump meant the wires below his feet, raised his mitted hand above his head in an effort to illustrate the distance. Jenkins' raised hand either touched the line above his head or came close enough to cause the electricity to arc onto the mitt. The contact of the electricity caused a flash and an explosion. Jenkins' clothes caught on fire, causing him severe burns with resulting disfigurement.

The evidence showed that Nash Contractors was awarded the painting job as a result of a competitive bid process. The evidence further showed that from 1957 to 1978, Gary Nash was an employee of Georgia Power Company. From about 1970–1978, Nash was a high line crewman. In this capacity, he worked on high voltage transmission lines. William Croker, a Georgia Power employee, testified that he had worked with Nash on an inspection project involving high voltage wires "quite a few years back." This was while Nash was still with Georgia Power, but after OSHA had been enacted. At this time, he and Nash had discussed the working distance clearances required on various high voltage lines. Croker testified in essence that he felt, based on that experience, that Nash was quite knowledgeable about OSHA safety requirements. In fact, he felt Nash's practical experience in working with high voltage lines exceeded his own.

Gary Nash testified as follows on cross examination by Jenkins' attorney:

Q. Did you have the requirements by the Occupational Safety Work and Health Act of 1970, associated rules and regulations, all applicable state and local safety and sanitary laws, regulations, and ordinances? Do you know what those laws were that were applicable to your work out there on those towers?

A. Yes, sir, some of them, but I didn't know all of them, no, sir.

Q. Tell me the ones you know.

A. I knew the footage on what OSHA required on different voltages.

Q. What is the distance required from this line to the worker under OSHA regulations of distance?

A. Three feet is what I thought it was.

Nash further testified as following on examination by Georgia Power's counsel:

Q. Mr. Nash, how much of your experience with Georgia Power Company dealt with working on and around transmission towers such as the one involved in this case?

A. You mean time limit?

Q. About how many years?

A. It would be hard to say, Mr. Bob. The power company has so many different structures. In the last eight years, I was on strictly a high line crew and, of course, they have got many different structures that carry 115,000 volt lines.

Billy Neal Crump, Nash's foreman, gave the following testimony in response to questions from Georgia Power's counsel:

Q. In your opinion, how close would you have to get to an energized conductor? What would be the closest point in order to paint the entire tower?

A. Well, you don't have a rule of thumb. I told them not to get any closer than the string of insulators.

Q. And this (indicating) would be the string of insulators?

A. Yes.

Q. And these tin insulators are what you are talking about?

A. Yes.

Q. Do you know how long that is?

A. No, sir.

Q. About three feet?

A. Well, that is about—my estimate is about three feet.

Q. Did you tell this to Mr. Jenkins?

A. I think so, yes, sir.

Q. You said don't get any closer than the string of insulators?

A. Yes.

Q. And he could have done that, could have painted and not come closer than that?

A. Yes, sir, I think so.

\* \* \* \* \* \*

Q. Can you say whether Mr. Jenkins when he raised his right hand up actually touched the conductor?

A. I can't say for sure.

Q. Could you say how close he came?

A. I would say he came pretty close.

Q. What do you mean by pretty close?

A. Well, I would say within two or three inches.

The trial testimony established that OSHA regulations require a minimum clearance of 34 inches with respect to a 115,000 volt line. The National Electric Safety Code, 1981 edition, requires a minimum clearance of 30 inches.

The court's charge, in relevant part, was as follows:

Now, in order to recover damages from the Defendant, Mr. Jenkins must prove the following:

First, that Georgia Power Company breached a duty of care to him or, in other words, was negligent as that term is legally defined.

Secondly, that Georgia Power's negligence was a legal or proximate cause of his injuries.

And three, damages.

\* \* \* \* \* \*

Now, with respect to the element of negligence in this case, I charge you that Georgia Power Company as owner of the transmission facility had a duty to warn Nash Industrial Contractors, Inc. of any nonobvious hazards inherent in the work Nash was to do on the towers which were known to Georgia Power Company.

However, Georgia Power had no duty to warn of obvious hazards or of any hazards which it knew Nash understood and appreciated. Because Nash was an independent contractor, the duty to warn of nonobvious hazards did not extend to Nash's individual employees such as Mr. Jenkins.

Thus, Georgia Power's duty under the law was solely to make sure that Nash understood and appreciated those dangers inherent in painting the transmission towers which were not of an obvious nature but which were known to Georgia Power Company, and the legal theory behind that principle of law is the expectation that Nash would then undertake to warn his employees of these nonobvious dangers.

I charge you that Plaintiff is not entitled to recover merely on a showing that his employer, Nash, was negligent. This is because, as I stated, Nash was an independent contractor. Rather, it is necessary for Plaintiff to show that the incident in question was proximately or legally caused by Georgia Power's negligence under the principles I have just outlined.

If the jury were to determine that Georgia Power was negligent in the manner described, you would then determine whether any such negligence on Georgia Power's part was the proximate or legal cause of Plaintiff's damages. TR. 524–526.

I charge you that negligence is the proximate or legal cause of damage if it directly and in natural and continuous sequence produces or contributes substantially to producing damage so it can reasonably be said that except for the negligence, the loss, injury, or damage would not have occurred.

Negligence may be a legal cause of damage even though it operates in combination with the act of another party, some natural cause, or some other cause if such other cause occurs at the same time as the negligence and if the negligence contributes substantially to producing the damage.

I charge you that negligence cannot be inferred from the mere happening of an event. In other words, you may not find that Georgia Power was negligent merely because the incident in question happened.

Now, Ladies and Gentlemen, if you were to find that the Defendant was not negligent in the manner I described, or if you were to find that any negligence of the Defendant did not proximately cause the Plaintiff's injuries, then you would return a verdict for the Defendant and you would proceed no further in your deliberations.

In its motion for judgment notwithstanding the verdict or in the alternative for a new trial, Georgia Power argues first that it is entitled to judgment in its favor because it had no duty to warn Nash, because he was fully aware of dangers inherent in doing the work. In support of its alternative request for a new trial, Georgia Power argues that the evidence was legally insufficient, and further that the court erred in failing to charge on the doctrine of assumption of risk, in failing to charge the jury that Georgia Power had no duty to the Plaintiff with respect to the condition of the tower; in failing to charge that Plaintiff was obliged to select a safe way of doing the work, if a safe method existed; in failing to charge that Georgia Power would not be liable if Plaintiff's injuries were due to the intervening negligence of Nash; in charging the jury on the principle of nonobvious hazards, when there were none under the evidence.

In Georgia, an owner and occupier of land has a duty to invitees to give warning or use ordinary care to provide protection against latent dangers known to the owner but not the invitees.[1] *Amear v. Hall*, 164 Ga.App. 163, 166, 296 S.E.2d 611 (1982). The basis of the owner's liability is his superior knowledge of the danger. *Id.* at 168, 296 S.E.2d 611. An invitee's actual knowledge of a latent defect or hazard vitiates the owner's duty to warn. *Apostol-Athanasiou v. White*, 176 Ga.App. 178, 179, 335 S.E.2d 442 (1985); *Tect Construction Company, Inc. v. Frymyer*, 146 Ga. App. 300, 302, 246 S.E.2d 334 (1978).

A landowner's duty to warn of nonobvious hazards on his premises is discharged by warning the contractor who comes onto the premises to perform the work. It is not necessary that the landowner warn individual employees of the contractor. *See Brown v. American Cyanamid and Chemical Corporation*, 372 F.Supp. 311 (S.D.Ga.1973); *Hodge v. United States*, 310

**1.** The court rejected Plaintiff's argument that Georgia Power is liable for Nash's negligence under O.C.G.A. § 51–2–5(2) (employer liable for contractor's negligence when work inherently dangerous), relying on *Georgia Power Company*

*v. Gillespie*, 49 Ga.App. 788, 176 S.E. 786 (1934) (Georgia Power not liable for contractor's negligence while rebuilding power lines in electric plant).

**1578**

F.Supp. 1090 (M.D.Ga.1969), *aff'd*, 424 F.2d 545 (5th Cir.1970). *See also Whitlow v. Seaboard Airline Railroad Company*, 222 F.2d 57 (4th Cir.1955) (interpreting Georgia law not to require warnings to individual employees of an independent contractor).

Applying the foregoing legal principles, the court found that the only respect in which Georgia Power might be deemed negligent under the evidence was in failing to adequately warn the contractor of the propensity of high voltage electrical current to arc and that a person should keep at least 34 inches from the energized line. Arguably, the possibility of an electric arc is a nonobvious hazard.

The court finds that there was a viable jury issue as to whether Jenkins' injuries resulted from Georgia Power's failure to specifically warn Nash that the painters should stay at least 34 inches from the lines because of the danger of an electrical arc.[2] The evidence of the extent of Nash's knowledge on this subject was not clear enough to take this issue from the jury. While Nash was an experienced lineman, and had worked around high voltage lines for a considerable time while employed at Georgia Power, his only statement to the jury concerning the safe working distance was that he "thought" it was three feet. Also, the extent of Nash's experience working on transmission towers similar to the one involved in this case was not entirely clear. Neither was it clear that the working conditions or protective equipment in use when Nash worked on high voltage transmission lines were the same as in the instant case. Therefore, it cannot be said that as a matter of law that Georgia Power had no duty to warn. The jury was entitled to consider whether the lack of specific warning was a substantial factor in causing Jenkins' injuries.

Turning to Georgia Power's motion for a new trial, the court finds that no prejudicial error was committed. The evidence was legally sufficient, in that Georgia Power indisputably did not communicate with Nash concerning hazards inherent to doing the work; the jury could have determined that Nash was not sufficiently knowledgeable about the required working distance. The jury could further have found that Jenkins' injury occurred when he raised his paint mitt close enough to the wire to cause the electricity to arc onto the mitt. A charge on the doctrine of assumption of risk was inappropriate because there was no evidence from which the jury could have found that Jenkins recognized the risk involved in placing his hand in proximity to the wire, and there was no evidence from which the jury could have found that Jenkins intentionally touched the wire. Georgia Power's charge request to the effect that it had no duty to Jenkins because it had surrendered possession of the tower was not correct, as Georgia Power had not deenergized the lines. It was not necessary to give Georgia Power's requested charge to the effect that Plaintiff was obliged to select a safe way of doing the work if a safe method existed because the relevant legal principles were adequately covered by the court's charge on contributory and comparative negligence.

Next, Georgia Power's request to charge on intervening negligence was not required to be given, as the legal principles contained therein were adequately covered by the court's charge on proximate cause. Finally, the court rejects Georgia Power's argument that it erred in charging the jury on duty to warn of nonobvious hazards. The court finds that the arcing phenomenon mentioned previously was a nonobvious hazard.

For the foregoing reasons, Georgia Power's motion for judgment notwithstanding the verdict is DENIED; said Defendant's motion for a new trial is hereby DENIED.

2. Possibly, the fact that oil-base paint was being used meant that even a 34 inch clearance was not adequate.